I3EPFERO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FERRING PHARMACEUTICALS, INC.,
    ET AL.,
4
                    Plaintiffs,
5
            v.                          17 CV 9922 (RWS)
6
    SERENITY PHARMACEUTICALS, LLC,
7   REPRISE BIOPHARMACEUTICS, LLC,

8                   Defendants.

9   ------------------------------x
                                        New York, N.Y.
10                                      March 14, 2018
                                        12:03 p.m.
11
    Before:
12
                        HON. ROBERT W. SWEET,
13
                                        District Judge
14
                            APPEARANCES
15
    WOMBLE BOND DICKINSON, LLP
16       Attorneys for Plaintiffs
    BY:  MARY WEBB BOURKE, ESQ.
17       DANA K. SEVERANCE, ESQ.
                AND
18  GIBBONS, P.C. (NJ)
    BY:  WILLIAM PAUL DENI, JR., ESQ.
19

20  JONES DAY
         Attorneys for Defendants
21  BY:  CHRISTOPHER J. HARNETT, ESQ.
         JAMES SOTTILE, IV, ESQ.
22       SHEHLA WYNNE, ESQ.
         KEVIN V. McCARTHY, ESQ.
23

24

25

I3EPFERO

```
 1                    (In open court)

 2                    (Case called)

 3             THE COURT:  Please be seated.  Thank you very much.

 4   Ferring.

 5             MR. HARNETT:  Yes, your Honor.  Chris Harnett arguing

 6   on behalf of Serenity and Reprise.  The Court convened a

 7   pretrial scheduling conference, the initial pretrial scheduling

 8   conference, with the parties in connection with the case that

 9   was transferred from the District of Delaware on February 21st,

10   and we convened in chambers.  Your Honor issued the order that

11   set today as the oral argument date for our motion to dismiss

12   for lack of subject matter jurisdiction.

13             As part of that order, your Honor asked the parties to

14   provide you with courtesy copies of all the papers that were

15   submitted in Delaware, which we've done.  In so doing, we

16   realized that our motion to dismiss was filed as part of a

17   combined motion with our motion to transfer the case from the

18   District of Delaware back here.  And in order to avoid any

19   confusion, we took your Honor up on the other part of the

20   February 21st order and that was to submit a supplemental brief

21   by last Friday.

22             In that supplemental brief, we tried to, in a very

23   concise form, I think we limited that to ten pages or so, a

24   very concise form to crystalize what we thought were the key

25   arguments that we wanted to discuss about our pending motion to
```

I3EPFERO

1    dismiss, which is being heard by your Honor today.

2          In that regard, we've also prepared a few slides that

3    will help us assist with the oral argument.  People can't do

4    arguments without slides anymore, and with your Honor's

5    permission, I'll hand them up.

6          THE COURT:  Sure.

7          MR. HARNETT:  There was an interesting story on NPR

8    once that blamed the Challenger disaster on powerpoint because

9    the O-rings were discussed on page 23 of a powerpoint and

10   nobody paid any attention to them.

11         Okay.  The crux of our argument is there's no subject

12   matter jurisdiction.  The declaratory judgment action that

13   Ferring brought against Serenity/Reprise in the District of

14   Delaware.  There is no case or controversy of sufficient

15   immediacy to impart subject matter jurisdiction for Ferring to

16   bring this declaratory judgment action challenging the validity

17   of Dr. Fein's three patents.

18         As we'll describe in more detail, and we described in

19   our papers, there is absolutely no reliable evidence, none,

20   that the FDA is poised, as Ferring suggests, to imminently

21   approve Ferring's Nocdurna product.  That product has been

22   rejected over and over again for the past eight years, and all

23   of the evidence from the FDA that is of record shows that the

24   FDA remains extremely concerned about the safety profiles and

25   the advocacy of the Nocdurna product.

I3EPFERO

1          The notion underlying Ferring's argument that product

2    approval is imminent is nothing but wishful thinking.  The

3    evidence from the FDA, if anything, suggests that Ferring's

4    product will never be approved, much less approved anytime

5    soon.

6          As a consequence of that lack of immediacy, because

7    there is no immediate case or controversy that your Honor needs

8    to resolve, Ferring is effectively looking for an advisory

9    ruling that Dr. Fein's three patents are invalid.  We submit to

10   your Honor that, under rule 1 of the Federal Rules of Civil

11   Procedure, Serenity and Reprise, two relatively small companies

12   who are working very hard now to get their approved Noctiva

13   product to the market, should not be burdened with the time and

14   expense necessary to defend against Ferring's challenge to

15   Dr. Fein's three patents that protect that patented product.

16         The procedural history of this case and the FDA

17   record, the actual statements of the FDA, not the wishful

18   thinking of Ferring, show that this case should never have been

19   brought, and it should be dismissed now.

20         So let's talk a little bit about the three patents

21   that are at issue here.  This Court has a considerable amount

22   of experience with those three patents in suit.  They are

23   Dr. Fein's '203, '321 and '761 patents, and those three patents

24   were the subject of the lawsuit that Ferring brought in this

25   court way back in 2012.

I3EPFERO

1           Back in 2012, when Ferring brought its complaint

2    directed to those three patents of Dr. Fein's, Ferring argued

3    that Ferring should be the inventer of those patents, not

4    Dr. Fein.  Ultimately, over the course of five years of

5    litigation, your Honor rejected Ferring's 14 separate state law

6    causes of action directed to those three patents, and based on

7    the grounds of equitable estoppel, ruled that Ferring could not

8    properly challenge -- make a federal inventorship challenge to

9    those three patents for which Dr. Fein is the inventor.  Your

10   Honor granted summary judgement under equitable estoppel that

11   Ferring could not be the -- challenge the invention of those

12   patents.

13          So what happened then?  After your Honor's rulings,

14   Ferring ran off to Delaware, and if we look at the first slide,

15   slide No. 1, Ferring didn't come to this court and challenge

16   the validity of those patents.  No.  What did Ferring do?

17   Before the equitable estoppel, in looking at slide 1, Ferring's

18   position was Dr. Fein's three patents were, A, that Ferring was

19   the rightful owner of them; two, that there were very valuable

20   inventive contributions of Ferring scientists; and that they

21   were worth tens of millions of dollars.  That's what Ferring

22   told your Honor.  That's what Ferring told this Court.

23          Then, after your Honor granted our motion for

24   equitable estoppel, things changed dramatically.  They ran off

25   to the Delaware, and they presented a series of absolutely

I3EPFERO

irreconcilable arguments.  Down in Delaware, they argued, well,

these patents are actually worthless.  They're no longer the

valuable contributions of Ferring's inventors.  They're invalid

for six different reasons.  The same -- these are the patents

that they read.  They knew about them.  They said they were

valuable.  They spent five years of your Honor's time saying

that they should be the rightful owner, and they should collect

damages.  They must have read the patents.

        But now, suddenly, after your Honor's equitable

estoppel ruling, they're worthless.  They're invalid for six

different statutory reasons, as well as a specious charge of

inequitable conduct on Dr. Fein's part.

        So we believe that, first of all, the assertions that

underlie Ferring's complaint here are utterly irreconcilable

are positions than they've taken previously with this Court.

In fact, if this case ever goes forward, and we don't think it

should because there's no case or controversy, we think that

Ferring has already conceded the validity of these patents.

        But we look at the next slide.  The next slide is a

timeline of Ferring's rather gymnastic efforts to avoid this

Court, after the equitable estoppel.  They turned cartwheels to

never have this motion to dismiss heard in this Court.  They

ran off to Delaware.  They filed the first complaint.  They

filed a second complaint.  They asked for extra briefing every

step along the way.

I3EPFERO

1          Even after Judge Sleet transferred the case back to

2     this Court, they filed a motion for reconsideration of the

3     transfer motion, which never has been granted in Delaware in

4     any case.  Notwithstanding the fact that Delaware is firing on

5     50 percent vacancies on the bench, they asked for rehearing on

6     their motion to transfer.  And even after the case was formally

7     transferred up to this Court and the clerk wheeled it to Judge

8     Hellerstein, Ferring argued it wasn't a related case after all.

9          It didn't matter that your Honor spent five years on

10    the dispute related to these three patents, the same parties,

11    the same parties' businesses, the same parties' product.  They

12    didn't want this Court to ever hear this case or this motion

13    because of the irreconcilable positions taken here for five

14    years and taken there in Delaware.

15         So that procedural history is by way of background,

16    and I think it highlights the lack of case of controversy and

17    the lack of merits as to the underlying case.  Your Honor may

18    remember, if we turn to slide three, Ferring and Serenity have

19    been trying to get competing products through the FDA.

20    Serenity succeeded.  Serenity got Dr. Fein's -- based on

21    Dr. Fein's inventions, Serenity got its Noctiva product

22    approved in March.

23         Ferring, on the other hand, has been trying

24    unsuccessfully for nearly nine years to get its product

25    approved.  The FDA, in the course of that nine-year review

process, has issued three complete response letters rejecting

Ferring's application.  And as part of that, the three complete

response letters, the FDA convened an advisory committee of

expert physicians, regulators, people who really know what

they're doing, and the advisory committee voted overwhelmingly

against Ferring's product.  It has been an utter failure in the

FDA.

The FDA has never indicated any willingness whatsoever

to approve that product.  But undeterred by that, it's bad

enough that Ferring has kept trying to get its product

approved, they actually tried to stop Serenity's product from

getting approved as well.  They filed a citizen's petition,

saying, okay, you're not approving our product, don't approve

Serenity's product either.

Well, that was last March.  Last March the FDA drew a

line in the sand, said, nope, Serenity's product is safe and

effective.  Yours is not.  We're denying your citizen's

petition.  Serenity gets approval.  You don't.  You don't get

to stop Serenity from getting approval.

And what you see on slide three is an undisputedly

accurate timeline that was published in this journal -- in this

publication called the pink sheet.  The pink sheet is basically

the daily, weekly -- I forget which way it comes out -- legal

publication letting the world know who's getting approved, what

drugs are doing what.

I3EPFERO

1          So the title of this article is "Tale Of Two

2     Desmopressins," it's kind of clever.  One was Serenity's

3     desmopressin product, Noctiva, and one was Ferring's

4     desmopressin product Nocdurna.  And what this shows that

5     April 22nd, 2010, the FDA rejects Ferring's product.

6     January 2013, another complete response letter refusing to

7     approve the product.  August 2013, still no good.

8     January 2015, the advisory committee convenes and votes against

9     it.  And right after that, the FDA grants another, the third

10    complete response letter, saying no approval.  And then in

11    March of 2017, they deny -- the FDA denies Ferring's citizen's

12    petition trying to keep Serenity's approved product off the

13    market.

14         So you heard a lot during the trial last month about

15    something called hyponatremia.  Dr. Fein testified about it.

16    Dr. Susman testified about it.  It's a very serious side effect

17    that can happen from the administration of desmopressin.

18    Desmopressin drugs like Ferring's proposed Nocdurna product.

19    So serious, in fact, that it can cause comas, seizures, cardiac

20    arrest.  That's about as serious as it gets.

21         And if you look at slide four, this is the vote of the

22    FDA advisory committee that the FDA convened to consider

23    Ferring's application.  The simple question that was asked is:

24    Does the demonstrated benefit of Nocdurna -- Ferring's

25    product -- outweigh the risks and support approval for nocturia

1    due to nocturnal polyuria?  Ten no votes, only five yes votes,

2    two abstained, and included among the no votes were several

3    cardiologists.  And, of course, cardiologists are doctors who

4    are concerned about disorders of the heart, the most profound

5    of which is cardiac arrest.

6         So if you read the notes, which are attached as

7    Exhibit A to our supplemental brief, of the advisory committee

8    meeting, the advisory committee specifically says the risk of

9    hyponatremia was a motivating factor behind the decision not to

10    approve Ferring's product.

11         Okay.  So where are we in terms of the record of this

12    case?  When Ferring ran off to Delaware, it was in April of

13    last year.  The declaratory judgment complaint that Ferring

14    filed was timed to coincide with Serenity's efforts to find a

15    new commercial partner after Allergan left the agreement.  So

16    there's Dr. Fein and Serenity trying real hard to find another

17    marketing partner.  They get sued in Delaware challenging

18    Dr. Fein's three patents.

19         And what's the evidence?  According to Ferring,

20    Ferring says, we need to have an immediate declaratory judgment

21    action where we get to challenge the validity of these patents

22    because we're about to get, imminently -- those are the words

23    that Ferring uses -- imminently going to get approved by from

24    the FDA.

25         What do we have in the record from the FDA?  Well, I

I3EPFERO

```
 1      showed you everything we had up until March of 2017.  That's

 2      the history of repeated rejections, and then there's the FDA

 3      also rejected Ferring citizen's petition.  The two most recent

 4      documents are in the record today supposedly supporting subject

 5      matter jurisdiction are a March 3rd letter from Dr. Janet

 6      Woodcock, and that was the letter explaining the reasons why

 7      the FDA rejected Ferring's citizen's petition, and then we have

 8      the March 6th minute meetings of a telephone conference between

 9      certain FDA representatives and Ferring.

10              A year has gone by since then.  A year has gone by,

11      and we have not seen a -- Ferring has the burden of proving

12      subject matter jurisdiction here, and a year has gone by and we

13      have not seen another piece of paper.  Your Honor gave them,

14      Ferring, an opportunity, gave us an opportunity to put in

15      supplemental briefs last Friday.  We did.  They didn't.

16      Presumably, if the FDA was poised to imminently approve this

17      product, there would be some piece of paper somewhere that says

18      so, but there isn't.

19              The last two pieces of paper reflecting the FDA's

20      thought process are more than a year old and both of them show

21      that the FDA is highly skeptical about the product, that the

22      FDA remains very much concerned about the risk of hyponatremia,

23      and the FDA has not retreated from its position that the risk

24      of hyponatremia outweighs the minimal benefit that has been

25      shown by Nocdurna.
```

I3EPFERO

1      So let's look at the letter from Dr. Woodcock.  That's

2  at slide five, and these are some quotes from the letter.  And

3  let me summarize.  I used to be a bench scientist before I went

4  to law school.  I wasn't a very good one, and so my lab

5  director was quite happy that I applied to law school.  And

6  there was an expression that's used in scientific labs; it's

7  called garbage in, garbage out.  Bad study design gives rise to

8  bad data.  Bad data generates bad conclusions all the way

9  around.

10      What Dr. Woodcock said, cutting through, summarizing

11 her arguments in the citizen's petition response, she explained

12 why the FDA was absolutely right in granting Serenity's

13 application and denying Ferring's application.  Serenity's

14 test -- its clinical study design was good.  Ferring's was not.

15 The problem with Ferring's design are a couple.  It's divorced

16 from the real word use of desmopressin, and that's a quote from

17 Dr. Woodcock, who's the boss.  She is the FDA's chief drug

18 approval officer.

19      She expressed concerns that Ferring's study design

20 would significantly understate the incidence of hyponatremia.

21 And why?  She explained why.  Ferring's clinical studies

22 allowed patients as young as 18 to be enrolled.  Serenity's

23 study design was older people.  Who gets hyponatremia?  Who

24 needs this drug?  Older people.  No 18-year-olds.  No college

25 soccer teams are taking desmopressin because they're going to

I3EPFERO

the bathroom in the middle of the night.  It's old people.  And their study design had a disproportionate cohort of young people, which would have displaced older people, who were more susceptible to hyponatremia.

The other thing, Ferring's study included specific patient instructions that said, don't drink before you go to bed at night, don't have any alcohol, don't have any caffeine. All probably pretty good advice, but it's a confound in the data.  If you're telling the patient don't drink before bed, it's not what's going to happen in the real world.  So if it shows any -- if the data shows any efficacy, it's contaminated. You can't tell whether the reduction in the number of times one has to go to the bathroom is a function of the fact that they didn't drink before bed, they stopped using caffeine, or they stopped using alcohol, or the fact that the drug really works. So Dr. Woodcock said that this study, Ferring's study, design is flawed.

Now, I'm going to move on to the next piece of documentation we have from the FDA, but it's very important to note that what Ferring is trying to do now with the FDA is to take this very same test data, the very same data from the very same experiments that the FDA has rejected repeatedly, that Dr. Woodcock has criticized the design of, and all they're doing is going back to the FDA and say, hey, give us an opportunity to reanalyze the test data and try again.

I3EPFERO

1          Because they've paid their application fee, under

2     statutes and regulations, the FDA, they'll look at it, and

3     that's all we've got.  The FDA has never said, oh, yeah, we

4     think we're going to approve this.  I'll show you exactly what

5     the FDA said, but before I do, let me just point out one thing,

6     and maybe something will change today.  In the mountain of

7     briefing you've seen on the motion to dismiss, Ferring never

8     once has said a word about Dr. Woodcock's criticism of the

9     study design.  They've just ignored it over and over again.

10    And this is the same study design that's the basis of their

11    ongoing application.

12          So let's look, the March 6th meeting minutes, that's

13    slide six.  This is the last word we have in the record from

14    the FDA, and what does it say?  Based on the fact that,

15    according to Ferring, I think their argument is -- it moves

16    around a little bit.  I think their argument is, by virtue of

17    the fact that the FDA is willing to let them submit the

18    reanalyzed data for analysis, that means something good is

19    going to happen.  It doesn't.  It simply means that they paid

20    their fee and the FDA will review it.

21          Look at the exact words.  That's what the FDA said.

22    This is a:  "The FDA noted that Ferring's NDA submissions to

23    date have not provided convincing evidence of a clinically

24    meaningful treatment benefit for Nocdurna."  Also, they said

25    that, as part of any ongoing submission, Ferring has to submit

I3EPFERO

1      a proposal for mitigating the risk of hyponatremia, the thing

2      that can kill you.

3              We've heard Ferring argue that, oh, at this point,

4      safety is a done deal.  They passed on safety.  Uh-uh.  The

5      last document from the FDA shows that they're still concerned

6      about hyponatremia.  The FDA cautioned it's unclear whether the

7      reanalysis of the data will result in a positive outcome, and

8      they're not going to be able to tell Ferring until they've

9      reviewed the whole thing.

10             We have not seen a paper, the Delaware court has not

11     seen a paper, your Honor has not seen a paper dated after

12     March 6th.  This is what they're hanging their hat on that

13     approval is imminent, and it's a year old, and there's nothing

14     more.  And you gave them an opportunity to show more and they

15     didn't.

16             So in the absence of any documents from the FDA, what

17     does Ferring do?  In their first amended complaint down in

18     Delaware, they submitted the declarations of two witnesses, two

19     declarants.  Who are they?  One of them is their outside

20     lawyer.  His name is Mr. Fox.  One of them is Ferring's project

21     manager.  Her declaration basically says, I read Mr. Fox's

22     declaration, I agree with it, and they both say, we're

23     optimistic.  We think there may be some approval.

24             But we tested this.  Right?  Let's look at -- when we

25     had Mr. Fox, we asked for Mr. Fox's deposition and one thing we

showed him was the statements from the meeting minutes of
March 6th, and that's on slide seven.  We've lined up some of
the FDA statements, and we've lined up what Mr. Fox says about
them.

When the FDA says, oh, you got to be concerned about
hyponatremia.  We can't promise you anything.  We'll review it.
To date, you haven't shown anything.  What does he say?  Ahh,
this is standard disclaimer language.  This is something people
could quibble with.  These are just theoretical possibilities.

Now, I invite your Honor to read the meeting minutes.
These are serious people at the FDA.  The FDA is concerned
about possibly approving a drug that could stop your heart.
They're not just saying things that you might quibble with,
mere theoretical possibilities.  This is serious business, but
that was the level of testimony that we got from their witness,
their paid lawyer, who testified that he was paid for the
declaration, that he was paid for the time preparing for the
deposition, that he expected to submit a bill for the time he
spent giving deposition testimony.  He was an advocate and not
a witness.

Now, it got so bad -- I had some questions that he
adhered so closely to the party line, he would not answer any
questions directly.  One question I couldn't help myself but
ask him:  Hyponatremia is a bad thing, right?  The answer to
that is yes.  It has to be yes.  Any honest answer to that is

I3EPFERO

1    yes.  Look at the answer he gives.  Well, it is what it is.

2    It's a side effect of the drug.  Yeah.  It's not serious

3    testimony.  It's not something that creates an actual

4    legitimate case or controversy that opens up subject matter

5    jurisdiction that should require Serenity divert its resources

6    from getting its product on the market to defend against a

7    specious challenge to its three patents, the same three patents

8    that Ferring said were the most valuable thing since sliced

9    bread when they were in front of your Honor five years ago.

10            Let me just say a few more words about the deposition

11   testimony here, and the reason I'm going to do that is because

12   during our conference in chambers last month, counsel for

13   Ferring made a couple of references to the order from Judge

14   Sleet down in Delaware when he granted the motion to transfer.

15   He denied Ferring's motion to submit an unauthorized surreply

16   brief and the motion to dismiss as moot.  And your Honor said

17   you'd allow it; fine, we'll take it on the merits, and that's

18   what I'm going to do now.

19            The whole gist, the whole gravamen of Ferring's motion

20   for leave to file a surreply, which is not authorized under the

21   Delaware rules, but was to take on the arguments that we

22   presented about the problems with their witnesses' testimony,

23   and that was the whole point of the surreply brief.  And they

24   basically -- we showed in our last paper that these

25   witnesses -- that their testimony shouldn't be credited.

1              I just want to give you a couple of examples here.

2      This is another excerpt from Mr. Fox's deposition.  One

3      question:  In your declaration you say that they -- being the

4      FDA -- have to balance the efficacy against the risk of

5      hyponatremia, right?  Now, a deposition testimony is no

6      different from the court testimony.  It's like someone sitting

7      up there in the witness stand.  If someone was sitting right

8      there in the witness stand, your Honor would say:  Answer the

9      question.  The answer to that question is yes.

10             What did I get?  I got 232 words of double speak.

11     Read it.  Count one to 232 in your head, see how long that

12     takes.  That's the kind of answer I got to virtually every

13     question I asked Mr. Fox, who is being put up to justify a

14     declaratory judgment action when the FDA is not in any position

15     or has given no indication they're going to approve the

16     product.

17             And if you look, there's some great irony here on the

18     next slide, when in that motion -- in that surreply brief

19     Ferring took the position, oh, we're being unduly critical and

20     harsh about Mr. Fox's testimony.  What he really was giving was

21     thoughtful and fulsome testimony.  Those are quotes, thoughtful

22     and fulsome.

23             But even when Ferring tried to -- wanted to quote

24     Mr. Fox, they quoted him, and this is another quote, in part.

25     They quoted 58 words of a 205 word answer.  The whole

I3EPFERO

deposition was a filibuster.  It was just a statement of the

party line.  It was not the sort of testimony that can support

declaratory judgment jurisdiction.

     The other witness was a woman named Ms. Tina Olson.

She's the project manager, and it was pretty clear that

Ferring, the whole point of -- one of the points of Ferring's

surreply is they wanted the entirety of Ms. Olson's transcript

in the record because at the very back of it Ferring's counsel

asked Ms. Olson a series of opinion questions.  Well,

Ms. Olson, in your opinion, is the FDA going to approve the

product?  In your opinion, is the FDA satisfied that

hyponatremia is not a problem?  X, Y and Z.

     We objected, and on redirect we established, well,

Ms. Olson is in no position to give that kind of opinion

testimony.  Her degree is an MBA.  Her background is in

business administration.  Her whole -- in her whole life, she's

had experience with three NDAs.  She's not a medical doctor.

She has no clinical experience.  She has no regulatory

experience.

     Yet, what we basically have here is Ferring has

nothing from the FDA; so they're trying to pad the record with

stuff from interested and, in one instance, they both are paid

witnesses, and that's all a sideshow.  What really matters, all

that matters here, is does your Honor have evidence in front of

the Court that the FDA is imminently poised to approve this

I3EPFERO

1  product?  And you don't.

2        What you have, the evidence you have from the FDA is

3  nine years of rejections, a letter from the chief drug approval

4  office saying the study design that you're asking us to

5  reconsider the data on masks the incidence of hyponatremia;

6  it's divorced from the real world; and you have meeting minutes

7  which says, we'll look at your data like we have to do under

8  the statute, but we're not promising you anything.  That's what

9  you have.

10        So what's motivating this, I believe, is Ferring -- if

11  you look at the history of this, Ferring sued Serenity/Reprise

12  here.  Ferring sued Serenity/Reprise in Delaware.  Ferring

13  provoked proceedings in the PTO for reexamination.  Ferring

14  provoked proceedings in the Hague.  Ferring wants Serenity and

15  Reprise to divert their limited resources from getting their

16  product on the market, out and running, and pay me.  And I

17  don't want them to pay me.  They shouldn't have to.  They

18  shouldn't have to assume the cost and burden of defending the

19  patents, defending the validity of the patents that Ferring has

20  already conceded about.

21        To the extent your Honor has any questions, I'm happy

22  to answer them or get up again later.  Thank you.

23        MS. BOURKE:  I'm good with the podium, since I'm a

24  little more soft-spoken, and make sure the court reporter can

25  hear me.

I3EPFERO

1           Good afternoon, your Honor.  Mary Bourke from Womble

2    Bond Dickinson, on behalf of the Ferring plaintiffs.  I want to

3    focus on what the issue is that is before the Court.  The issue

4    before the Court is whether this Court can exercise subject

5    matter jurisdiction to invalidate a patent when somebody,

6    namely Ferring, fears that they may be sued for infringement.

7    That's what the Declaratory Judgment Act is all about.

8           We're not here seeking an advisory opinion.  We're

9    here for freedom to operate.  And I will address the imminency

10   of approval, but the history of the -- we might want to start a

11   little bit with the history, the procedural history of the

12   litigation.  First off, just to orient the Court, this is a

13   declaratory judgment action against three patents that name

14   Dr. Fein as the sole inventer, which Serenity and Reprise have

15   asserted that Ferring's oral dispersible dosage form of

16   desmopressin, which is called Nocdurna, will infringe, if

17   approved.

18          So let's take us back in history.  There was the

19   lawsuit in front of your Honor that was filed, that we went to

20   the counterclaim trials on a month ago, was filed in 2012.  It

21   was filed as an entitlement claim, and there was no declaratory

22   judgment filed then because we didn't have a basis to do that.

23   There was no imminency of approval.  You've heard about how we

24   had struggles with the FDA during that time frame.  So that was

25   an entitlement action.

I3EPFERO

1    Your Honor issued an opinion that we were too late in

2    bringing that, and we were estopped, equitably estopped.  Fine.

3    That's fine.  Fast forward, and we'll get to the regulatory

4    history, but the timing of the DJ action has nothing to do with

5    Serenity and Reprise's activities.  It has to do with the sea

6    change that occurred within the FDA about how they were viewing

7    these desmopressin products to treat nocturia and specifically

8    how they were viewing the NDA that Ferring had filed for

9    Nocdurna.  That's why the lawsuit was brought.  There was a sea

10    change, which led to a very strong belief amongst everybody

11    that approval would be imminent.

12    Let's just address the commentary that was made by

13    counsel for Serenity and Reprise about somehow the actions, the

14    declaratory judgment action is somehow inconsistent with the

15    entitlement action.  They're not inconsistent at all.  What

16    happened was your Honor told us we were too late to bring our

17    entitlement action.  Okay, fine, but we were not too late in

18    bringing a declaratory judgment action.

19    We brought a declaratory judgment action when we felt

20    we had imminent approval, and the declaratory judgment action

21    is also making the same claims that Dr. Fein is not the sole

22    inventer of those patents.  That's the same basis.  It's

23    brought under 35 U.S.C. 102F.  We're basically saying that

24    those patents are Ferring's intellectual property assets and,

25    quite frankly, if we can't get them back from an ownership

I3EPFERO

```
1     standpoint, we don't want them being used as a sword against us
2     for our soon-to-be-approved product.  So that is not
3     inconsistent at all.
4          Quite frankly, it really is Serenity and Reprise that
5     are being inconsistent here before this Court.  They want the
6     Court to believe that there's no imminency of the approval of
7     Nocdurna, yet, in this action.  Yet, they are vigorously
8     pursuing the counterclaims for the Ferring patents, which are
9     the formulation patents that we went to trial, in part, on a
10    month ago that cover oral dispersible dosage forms of
11    desmopressin, and the only commercial or economic value of
12    those patents is because they cover Ferring's
13    soon-to-be-approved Nocdurna product.
14         In fact, in the recent standing briefing that was
15    filed just last Monday night, Serenity and Reprise argued for
16    the first time that they had standing by virtue of its
17    financial interest.  Allergan had standing when they brought
18    the counterclaims by virtue of its financial interest in the
19    Ferring patents, and this is, quote, from docket 321 "to the
20    extent the Ferring patents cover any products formulated to
21    deliver low-dose desmopressin, Allergan, as Reprise's exclusive
22    licensee had a financial interest in correcting the ownership
23    of those patents."
24         The only product that is going to be covered by those
25    patents, it's not their Noctiva product, it's Ferring's
```

I3EPFERO

1    Nocdurna product.  They can't have it both ways.  They can't,

2    at the one point say they had some financial interest in our

3    patents based on a soon-to-be-approved product, Nocdurna, and

4    then come to this Court in the DJ claims that we brought and

5    say they're never going to be approved.

6          Finally, they made a point about how Serenity and

7    Reprise have limited resources, they're focused on bringing

8    their Noctiva product to market, and they shouldn't be forced

9    to assume the burden expense with the DJ action.  Again, that's

10   inconsistent with them vigorously pursuing this counterclaim

11   trial, which doesn't cover their product Noctiva.  The only

12   product those claims of those patents cover, Ferring's patents,

13   is Nocdurna.

14         Moreover, I would just also explain that, quite

15   frankly, those statements are simply wrong.  It's Avadel, the

16   party that I think in the pretrial conference we mentioned we

17   would like to join.  It's Avadel that is carrying those

18   expenses, and I have a couple of slides that we can help

19   summarize.

20         Can we approach?  And while we're handing the slides

21   up, you'll recall that the reason that we asked for reargument

22   in Delaware was because Avadel, we learned after the fact,

23   might be needed to be added as a party to the litigation.

24   Avadel was a Delaware corporation.

25         As an aside, there's nothing wrong with filing a

I3EPFERO

motion for reargument in Delaware.  I've done it all the time
and, quite frankly, I've gotten them granted.  So I don't
understand the statement by counsel that they're not permitted,
but leaving that aside, let's take the comment that they have
limited resources and they're focusing these resources on the
approval of Noctiva and bringing it to market.

         If you look at the first slide we have there, you can
see that this is from the Avadel license agreement that was --
we found it from an internet search.  It's publicly available,
but it's redacted in part.  But you'll see that there are --
licensee, in this instance, is Avadel, who is the exclusive
sub-licensee to the Fein patents, and its licensee at its
expense will develop a sales training plan and sales training
materials, et cetera.  Licensee, at its expense, will train its
sales representatives in accordance with such sales training
plan and sales training materials.  It's the licensee, at its
expense, that is developing the advertising and promotional
tools.  And it's the licensee that's responsible for the
manufacture and supply of the product for commercialization.

         And what does Serenity do?  If you turn to the next
slide, it's Serenity just sitting there receiving milestone
payments.  The initial fee for the license agreement, they got
$50 million.  When the product launches, they'll get another 20
million.  They have commercialization milestone payments, and
they receive stacking royalties based on level of sales.  These

I3EPFERO

1    companies are not destitute.  They can afford this lawsuit,

2    just as they can afford the counterclaim lawsuit that they're

3    so vigorously pursuing.

4            So let's take a look at the regulatory history because

5    I think it's important for the Court to understand what's going

6    on.  There was a slide that Serenity put up that tried to show

7    the regulatory history.  It was their slide three, and if you

8    turn to my slide four, this is the pre March 2017 regulatory

9    history.  We don't dispute it.  We don't dispute that we filed

10   the NDA in 2009.  We don't dispute that we got three complete

11   response letters rejecting the NDA.  That's facts of record.

12   We don't dispute that.

13           What we do dispute is what the sea change in the FDA

14   occurred after that, and it's important on my slide, for slide

15   four, you'll note that when Ferring filed its NDA back in June

16   of 2009, it was assigned to a particular division within the

17   FDA, which we have a shorthand here DMEP, which stands for the

18   Division of Metabolism, Endocrinology Products.

19           When Serenity filed its NDA for Noctiva, it was

20   assigned to a different division, a division called the

21   Division of Bone, Reproductivity, Urological Products.  And

22   that's significant.  Why?  Because back in 2009, when Ferring

23   filed its NDA, the desmopressin had been approved for

24   diabetes-type indications.  That's why it was assigned to the

25   division dealing with endocrinology.

I3EPFERO

1          When Serenity filed its NDA, it was for the indication

2     of nocturia, which is a voiding disorder or urological problem,

3     and so it was assigned to a different division, which composed,

4     in large part, urologists, which understood the unmet medical

5     need for a drug to treat nocturia, which heretofore was not

6     understood.  And it also understood how to manage the risk with

7     hyponatremia, which is there for all desmopressin products.

8     It's there for Noctiva, as much as it is there for Nocdurna.

9     And I would just add Noctiva has a big black box warning on its

10    product for hyponatremia.

11         So what happens?  Yes, we filed a citizen's petition.

12    We're entitled to do that.  We were concerned that the FDA was

13    going to apply different standards for efficacy and safety to

14    Serenity's Noctiva product relative to Ferring's Nocdurna

15    product.  So what happens?  The timing is just, it speaks a

16    thousand words.  So on the day that they deny our citizen's

17    petition, and before they publicly announce the approval of

18    Noctiva, they pick up the phone and call one of the head

19    regulatory people at Ferring.

20         That's unheard of in FDA history.  Unheard of.

21    Particularly because in the cycle of things, what was

22    outstanding was the 2015 complete response letter.  So actions

23    in regard to that were really up to Ferring, but here, we have

24    the FDA picking up the phone, calling us and saying, well,

25    we're going to deny your citizen's petition.  We'd like a phone

I3EPFERO

1    call with you on March 6th.  And in the denial of the citizen's

2    petition, they also invited Ferring to make a similar showing

3    of clinical efficacy based on the existing data that Ferring

4    had already submitted.

5         Fast forward to the March 17 meeting minutes.  This is

6    the other document that Serenity's counsel's talked about.

7    They explain that the -- and this is, for the record, I believe

8    it's Exhibit B to the supplemental briefing -- no, I apologize.

9    It is Exhibit D to the supplemental briefing.  But what it says

10   is, on the slide there that's really significant, FDA's

11   thinking has expanded about data that could be used to

12   demonstrate a clinical meaningful benefit for desmopressin

13   drugs to treat nocturia.

14        So all of this history is summarized in the

15   declaration of Mr. Fox, who, quite frankly, wasn't paid to

16   testify.  He has been Ferring's regulatory counsel long before

17   this action was ever filed.  He helped Ferring through the

18   regulatory process, and he put in a declaration as to the

19   facts.  And, quite frankly, he used to work within the FDA

20   before he became outside counsel; so he understands the

21   workings of the FDA.

22        He summarizes this history, as does Tina Olson, and

23   basically what happened was there was this sea change.  All of

24   a sudden, back in 2015 when Ferring's NDA had been rejected,

25   the FDA had taken the position that Ferring was going to have

I3EPFERO

1  to run a new clinical trial with a new patient-reported outcome

2  device.  And what happened was, no, they had recognized,

3  through this process, that that was not necessary.  They were

4  familiar with our data, which they had said had shown a

5  statistically significant drug effect.  And they said, no, you

6  can come back and reanalyze your data, and we'll agree on the

7  five primary endpoints we want you to show, and you don't have

8  to run any other clinical trial, and you don't need a

9  patient-reported outcome anymore.

10  So based on that activity in March, there was a clear

11  regulatory path forward for Ferring with its NDA, and that

12  hasn't changed.  We submitted in our amended complaint, and

13  this is at paragraph 105 -- and this is the next slide, 6 -- we

14  set forth sort of a timetable of things that were to occur.

15  Right?  Quite frankly, every single one of those events has

16  occurred as we pled.

17  Now, did we produce additional documents?  No.

18  Because the law is generally that standing has to exist at the

19  time that you file the complaint.  So we didn't come in and put

20  in a supplemental pleading, but we can, since they've invited

21  us and they've complained that we haven't produced any

22  additional documents.

23  We have today additional documents, which we can hand

24  up to the Court and to Serenity and Reprise that demonstrates

25  that every single one of the events that is on slide six

I3EPFERO

1    occurred as predicted.  In other words, Ferring's NDA is on

2    course for approval in the second quarter of 2018, which we're

3    almost there.  We've been playing around for a year on all of

4    these pretrial motion practice and there's been no discovery,

5    no nothing because of this motion to dismiss.

6          But we have the correspondence that demonstrates that

7    all of these activities occur.  You can see on slide seven a

8    formal response to Ferring's submissions of its final revised

9    SAP, that the DBRUP is expected by the end of July 2017.

10   Indeed, we have an e-mail that goes to the regulatory person at

11   Ferring, Brenda:  Just to let you know, we have completed our

12   review of your SAP and it is acceptable to the biostatistics

13   review team.  Have a great day.

14         Next event, by August 2017, Ferring will request a

15   formal pre-NDA meeting with the FDA, which should be scheduled

16   for no later than October 2017.  Indeed, here we have the

17   letter of August 2017, where we submit a meeting request for as

18   soon as possible.

19         Indeed, by August 2017 the meeting request was

20   granted, and the meeting was scheduled for October 18, 2017.

21   That's on slide nine.

22         And, indeed, we submitted the new drug application in

23   December of 2017 with the reanalyzed data and, indeed, the FDA

24   accepted it and, indeed, put out the goal date of June 21,

25   2018.  That's the date that Ferring expects approval.  That

I3EPFERO

1    date is imminent. We're in March of 2018 now.

2            With respect to Mr. Fox's testimony and Ms. Olson's

3    testimony, we would invite the Court to read the surreply. We

4    would invite the Court to look at the deposition transcripts.

5    They answered the questions as best as they could. They just

6    didn't give the answers that Serenity's counsel wanted to hear.

7            So what do the courts look at for subject matter

8    jurisdiction? That's the issue that's before the Court, and so

9    we've summarized them on slide 12, and it's also in our briefs.

10   Are the parties competitors in a field related to the patents

11   in suit? That can't be disputed. Is there a history of

12   litigation between the parties particularly involving related

13   products and patents? I don't think that can be disputed.

14   There are assertions of infringement by the patent holder? I

15   don't think that can be disputed. We'll skip over likelihood

16   of approval because that's all they really seem to dispute. Is

17   the accused product fixed at the time that the relief was

18   sought? It's fixed. There's no formulation required. There's

19   no new clinical data that is going to be generated.

20           Is it going to be approved? Yes. We fully expect it

21   to be approved in the next couple of months. We need freedom

22   to operate. This product has been approved in multiple

23   countries in Europe and in Canada, and we have all the

24   expectation that it is going to be approved here in the U.S.

25   and the FDA's actions from March of 2017 confirm that. They

I3EPFERO

 1   were not routine actions.  They were out of the ordinary.  In

 2   fact, I think Mr. Fox called them "extraordinary" based on his

 3   experience within the agency.

 4          So we're here today.  We'd like to get this case

 5   going.  We've had no discovery.  I have on the last slide,

 6   their general objections to our document requests.  If you

 7   recall, your Honor, when we had the pretrial conference, I told

 8   you that they had not responded to our document requests.  They

 9   still haven't.  They won't do it until the motion to dismiss

10   has been decided.

11          We have outstanding document requests.  We have a

12   proposed protective order to provide to them.  They are

13   essentially granting their own stay and have done so for a

14   year.  That's improper.  We have a schedule that was agreed

15   upon and submitted to the Delaware court.  I'm happy to hand

16   that up to the Court, if you'd like to see it, but we need to

17   get going because all of a sudden we're going to have approval

18   and who knows what will happen then.  We may be faced with

19   emergency motions and other activity, but we filed this nearly

20   a year ago and absolutely nothing's happened.  So unless the

21   Court has any questions....

22          THE COURT:  Thank you.

23          MS. BOURKE:  Okay.

24          MR. HARNETT:  May I respond briefly?  Two minutes,

25   maybe.

I3EPFERO

1           THE COURT:  All right.

2           MR. HARNETT:  Just like I said, not a word about

3    Dr. Woodcock's criticism of the clinical trial design, not a

4    word.

5           Ordinarily, I'd complain.  I said when I stood up here

6    that they have not produced a single document from the FDA that

7    was less than a year old.  Ordinarily, I'd complain if somebody

8    came to court and said:  Here are some documents, I'm going to

9    show them to the judge and you haven't seen them before.  I

10   looked at the slides.  They don't say anything.  They're

11   basically transmittal letters.  You submitted the data.  All

12   right.  The statistical analysis plan?  That's acceptable.  All

13   that means is the way you're analyzing the data is

14   statistically sound.  That doesn't say anything about whether

15   the results are okay.  It says, okay, there's a -- what's the

16   exact phrase?  The payment fee date of June or July?  Yeah.

17   That means you're going to get an answer.  What could the

18   answer be?  It could be yes, but based on past history, it's

19   not going to be.  Based on the fact that they won't say

20   anything about Dr. Woodcock's assessment of the study design,

21   it's not going to be yes.  It can be, we need more information;

22   it could be a fourth no.  And that's what we think it's going

23   to be.

24          There's been no agreed-upon schedule.  That's just not

25   right.  There was never an agreed-upon schedule.  There were

I3EPFERO

1    competing schedules that were put in in response to the clerk's

2    order.  There was no -- it just never happened.

3           The words from the FDA are the words that matter.  The

4    fact that counsel here thinks that there's going to be

5    approval, the fact that people at Ferring are hoping there's

6    approval, that doesn't matter.  Read the words from the FDA.

7    The FDA says they're concerned that the drug stops people's

8    hearts.  They're concerned that the minimal amount of efficacy

9    that it's shown does not outweigh that risk.  It's been that

10   way since the beginning of the case.  It's been that way now.

11          We're not delaying anything.  We didn't run off to

12   Delaware and file a lawsuit in a jurisdiction where half the

13   judges are vacant.  We didn't do that.  They could have filed

14   the lawsuit here, but they ran away because the arguments that

15   they're making here that the patents are invalid are

16   irreconcilable with the argument they made to your Honor that

17   they're worth $50 million.  Thank you, your Honor.

18          MS. BOURKE:  Your Honor, one thing?  Can I just say --

19   I forgot to do this in my argument.  On that Woodcock letter,

20   Mr. Fox was cross-examined for nearly an hour on that very

21   letter and on the criticism of the clinical trials.  It's in

22   Mr. Fox's deposition transcript.  It begins at page 75.

23          THE COURT:  Thanks.  We'll have a short recess.

24          (Recess)

25          THE COURT:  If there's any doubt about it, I'm not

I3EPFERO

1    going to decide that this afternoon.

2             MS. BOURKE:   Thank you.  I was just waiting to be

3    excused.

4             (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25